IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| (1) ROBERT GATES,<br>(2) ROBERT GATES, as Personal Representative of the Estate of RITA GATES, deceased, and<br>(3) JULIO MELENDEZ,<br><br>    Plaintiffs,<br>v.<br><br>(1) CITY OF TULSA, OKLAHOMA,<br>(2) SAMANTHA RAMSEY,<br>(3) DON HOLLOWAY,<br>(4) M. SWEGER,<br>(5) THOMAS SHOCKLEY,<br>(6) K. SIRES,<br><br>    Defendants. | Case No.: 25-cv-00640-JFJ<br><br>ATTORNEY LIEN CLAIMED<br>JURY TRIAL DEMANDED |

## COMPLAINT[1]

COME NOW the Plaintiffs, Robert Gates, Robert Gates, as Personal Representative of the Estate of Rita Gates, and Julio Melendez, by and through their attorneys of record, and for their causes of action against the above-named Defendants, allege and state the following:

### PARTIES, JURISDICTION AND VENUE

1. Plaintiff Robert Gates ("Mr. Gates") is a resident of the State of Oklahoma and resides in Tulsa County.

2. Rita Gates ("Mrs. Gates") was a resident of the State of Oklahoma and resided in Tulsa County. Mrs. Gates, Mr. Gates' late wife, passed away on May 12, 2024. Mr. Gates has been

---

[1] This Complaint is being refiled pursuant to Oklahoma's Savings Statute, 12 O.S. § 100. The original case was dismissed without prejudice on November 25, 2024. *See* 23-CV-352-CVE-SH, Doc. No. 29.

appointed as the Personal Representative of Mrs. Gates' Estate.

3. Plaintiff Julio Melendez ("Mr. Melendez") is a resident of the State of Oklahoma and resides in Tulsa County.

4. Defendant City of Tulsa ("City" or "Defendant City"), Oklahoma is a municipality located in Tulsa County, Oklahoma. The City provides and employs the Tulsa Police Department ("TPD").

5. Defendant Samantha Ramsey ("Det. Ramsey") is a resident of the State of Oklahoma. Det. Ramsey was, at all times relevant hereto, acting under color of state law, and in the scope of her employment, as a detective in the Financial Crimes Unit employed by the City of Tulsa/Tulsa Police Department.

6. Defendant Don Holloway ("Officer Holloway") is a resident of the State of Oklahoma. Officer Holloway was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, as a police officer employed by the City of Tulsa/Tulsa Police Department.

7. Defendant Thomas Shockley ("Officer Shockley") is a resident of the State of Oklahoma. Officer Shockley was, at all times relevant hereto, acting under color of state law, and in the scope of his employment, a police officer employed by the City of Tulsa/Tulsa Police Department.

8. Defendant K. Sires ("Officer Sires") is a resident of the State of Oklahoma. Officer Sires was, at all times relevant hereto, acting under color of state law, and in the scope of their employment, as a police officer employed by the City of Tulsa/Tulsa Police Department.

9. Defendant M. Sweger ("Officer Sweger") is a resident of the State of Oklahoma. Officer Sweger was, at all times relevant hereto, acting under color of state law, and in the scope of their employment, as a police officer employed by the City of Tulsa/Tulsa Police Department.

10. The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1343 to secure protection of and to redress deprivations of rights secured by the First, Fourth and Fourteenth Amendments to

the United States Constitution as enforced by 42 U.S.C. § 1983, which provides for the protection of all persons in their civil rights and the redress of deprivation of rights under the color of law.

11. This Court also has original jurisdiction under 28 U.S.C. § 1331 to resolve a controversy arising under the Constitution and laws of the United States, particularly the First, Fourth Amendment and/or the Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

12. The acts complained of herein occurred in Tulsa County, Oklahoma. Jurisdiction and venue are thus proper under 28 U.S.C. §§ 116(a) and 1391(b).

## STATEMENT OF FACTS

13. Paragraphs 1-12 are incorporated herein by reference.

### The Fraud

14. In 2017, Plaintiff Robert Gates founded a high complexity medical testing laboratory in Tulsa named Cogent Medical Laboratory, LLC ("Cogent").

15. At all pertinent times Mr. Gates was the owner of Cogent.

16. Cogent's primary business since its inception was to provide blood testing services to various nursing homes and care facilities throughout Oklahoma and neighboring states.

17. Cogent operated out of Suite 110 of an office building located at 6914 S. Yorktown Ave, Tulsa, OK ("Office Complex").

18. At all pertinent times, Defendants Simple Church and Aaron DeBorde owned the Office Complex.

19. In the summer of 2020, in the midst of the initial wave of the COVID-19 pandemic, Defendants Michael Parra and Michael Blundetto approached Mr. Gates about using Cogent's lab in Suite 110 of the Office Complex to perform COVID-19 PCR testing for the government.

20. At the time, Parra and Blundetto represented to Mr. Gates that they had a contract with the

Federal Government to provide COVID testing for the Veteran's Administration ("VA") hospital system, and that the contract would generate between 300,000 and 1,000,000 COVID tests per month.

21. Parra and Blundetto estimated that the revenue generated by this contract would be at least $18 million/month.

22. Unbeknownst to Mr. Gates, Parra and Blundetto had no such contract or agreement with the Federal Government.

23. Parra and Blundetto provided Mr. Gates with an alleged letter from United States Senator Jerry Moran and a document that purported to be a contract with the VA.

24. Upon information and belief, both the letter and the "contract" were fabricated by Parra and Blundetto.

25. In furtherance of their scheme, Blundetto and Parra also showed Mr. Gates fabricated emails that purported to show them communicating with senior White House officials regarding COVID-19 testing.

26. Given the time-sensitive nature of COVID testing, Optimum Lab Services, LLC ("Optimum") – the company that Blundetto and Parra planned to use for the COVID work – needed lab space, molecular (not blood) testing equipment, and a Clinical Laboratory Improvement Amendments ("CLIA") license.

27. Because Cogent was already certified as a high complexity lab, Optimum could get the COVID lab up and running faster by purchasing the assets from Cogent as opposed to obtaining new licenses, equipment, and space.

28. On October 5, 2020, Cogent entered into an Asset Purchase Agreement ("APA") with Optimum, under which Optimum was to purchase certain lab equipment and assets from Cogent as listed in the APA.

29. As part of the APA, Gates, Parra, and Blundetto became equal partners of Optimum, which each owning 1/3 of it.

30. At the time, the assets sold to Optimum were those assets necessary for Optimum to operate a COVID laboratory ("the COVID Lab").

31. Cogent retained the assets utilized in connection with the blood and other tests for nursing homes ("the Nursing Home Lab").

32. Gates, Parra, and Blundetto all understood that the APA only provided that Cogent would sell certain assets and equipment to Optimum necessary for COVID testing. Those specific assets are listed in "Schedule 2" of the APA.

33. In addition to selling those assets, Optimum agreed to take over responsibility for the Lease of Suite 110, where the COVID Lab would be located, and also purchased Cogent's CLIA license, website, and COLA license.

34. Mr. Gates decided to operate the Nursing Home Lab under a new entity, Alpha Medical Laboratory ("Alpha").

35. In or around November 2020, Mr. Gates/Alpha leased Suite 130 of the Office Complex from Simple Church and planned to move the Nursing Home Lab equipment into Suite 130.

36. However, moving the Nursing Home Lab equipment to Suite 130 required significant work and care, as the equipment is expensive and difficult to safely move. Additionally, work needed to be done to Suite 130 to prepare it for operation.

37. As a result, there was a period of transition in November 2020 during which the COVID Lab (owned by Optimum/Parra/Blundetto) and the Nursing Home Lab (owned by Cogent/Alpha/Gates) operated side-by-side.

38. During this time, Gates managed both the COVID Lab and Nursing Home Lab. He also maintained an office in Suite 215 of the Office Complex.

39. In preparation for what Gates believed would be a large increase in testing volume, Gates contacted Thermo Fisher Scientific ("Thermo Fisher") and contracted with them for approximately $11 million in additional molecular instrumentation and COVID lab consumables.

40. Parra and Blundetto falsely told Gates that in addition to their VA contract, they had secured federal funding that would pay for the Thermo Fisher equipment.

41. Since Optimum had not yet set up a bank account that could accept Medicare/Medicaid payments during the transition period, the income from the COVID Lab and the Nursing Home Lab first went into the Cogent accounts.

42. At this time, the only COVID tests being performed were on samples gathered by Alpha's phlebotomists from nursing homes. There were no COVID tests performed under the alleged government contracts Parra and Blundetto claimed to have secured.

43. To ensure that Optimum obtained the income related to COVID tests, Gates paid Optimum out of the Cogent/Alpha accounts $70 for every COVID test performed.

44. Because Alpha's nursing home customers often paid less than $70 for COVID tests, this actually resulted in Optimum receiving more income from the COVID tests than Alpha actually collected.

45. By January 2021, the relationship between Gates and Parra and Blundetto was strained for myriad reasons.

46. Most importantly, Optimum never paid Alpha the consideration under the APA. The APA required Optimum (Blundetto and Parra) to make monthly payments on certain debt obligations of Cogent/Alpha to Simmons Bank and Medicare totaling approximately $1.5 million. *However, Blundetto and Parra never made a single payment.*

47. By this time, Gates suspected that Parra and Blundetto had merely enticed him into signing the APA by falsely claiming to have government contracts that did not exist.

48. Despite having a lab capable of performing COVID testing, Parra and Blundetto had yet to secure any government COVID-19 testing business (which was under the sole purview of Parra and Blundetto.

49. When Gates pressed Parra and Blundetto as to why they hadn't received any samples from the VA in the months since the APA was finalized, Parra and Blundetto changed their story and said that their agreement with the VA simply allowed them to get contracts from VA and US military laboratories.

50. Gates was also concerned about how the revenue generated by the COVID Lab and the Nursing Home Lab – which initially was going into Alpha/Cogent's checking account – was being accounted for.

51. Once Optimum was able to open its own bank account, Gates transferred the COVID Lab revenue from the Cogent/Alpha account into the Optimum Account.

52. However, Gates discovered that Parra and Blundetto withdrew $500,000 from the Optimum account – of which he was 1/3 owner – and paid directly to Parra and Blundetto individually. Parra and Blundetto took this money without Gates' consent and for no legitimate business purpose.

53. Around the end of January 2021, Gates moved the Nursing Home Lab equipment into the new space in Suite 130 down the hall from Suite 110.

54. The equipment Gates moved was solely owned by Cogent/Alpha and was not included in the APA with Parra, Blundetto and Optimum.

55. Once Gates finished moving the Nursing Home Lab equipment to Suite 130, Parra and Blundetto became upset. They acted as if Optimum had purchased all of Cogent's assets, as opposed to just the COVID testing equipment. The APA, however, clearly provides that Optimum was to only acquire certain COVID testing equipment and not the Nursing Home Lab equipment.

56. In retaliation for Gates moving the equipment that he solely owned down the hall, Parra and

Blundetto filed a civil lawsuit[2] against Gates, alleging, *inter alia,* that Gates had stolen the Nursing Home Equipment when he moved it to Suite 130.

57. In May 2021, Tulsa County District Judge Nightingale held an evidentiary hearing on Parra and Blundetto's second request for injunctive relief and return of the Nursing Home Lab equipment at issue in the First Civil Litigation.

58. Shortly thereafter, Judge Nightingale entered an Order awarding Mr. Gates over $40,000.00 in attorneys' fees arising from the legally infirm action. Blundetto and Parra have not paid any of this award as of this submission.

59. Unhappy with the course of the First Civil Litigation, Parra and Blundetto made numerous blatantly false statements to the Tulsa Police Department ("TPD"), claiming Gates had stolen significant amounts of lab equipment from them.

60. Again, all the equipment on the search warrant was solely owned by Cogent/Gates, but Parra and Blundetto falsely told TPD that the equipment belonged to them.

61. On August 6, 2021, Defendant Ramsey sent Mrs. Gates[3] a letter indicating that she was "investigating a criminal case in which" Mrs. Gates was "listed as the suspect."

62. Det. Ramsey wrote that if Mrs. Gates "cho[]se to ignore this request," she would "have no choice but to rely on reports and statements made by [Blundetto and Parra], witnesses and other parties involved , which may lead to felony charges being filed on you and multiple arrest warrants being issued."

---

[2] *See Optimum Lab Services, LLC, et al. v. Alpha Medical Laboratory, LLC, et al. v. Michael Parra and Michael Blundetto*, Tulsa County Case No. CJ-2021-948; and *Optimum Lab Services, LLC, et al. v. Alpha Medical Laboratory, LLC, et al.*, Tulsa County Case No. CJ-2021-266 (previously dismissed) (these cases are hereafter referred to as the "First Civil Litigation"). Mr. Gates ultimately prevailed in the First Civil Litigation and received a Judgment against Parra and Blundetto for approximately $1.5 million that has not yet been paid.
[3] Det. Ramsey sent Mr. Gates an identical letter on August 6, 2021.

63. Det. Ramsey further wrote that "[Parra and Blundetto] [are] claiming that you committed fraud and has provided evidence to support their claim."

64. Finally, Det. Ramsey wrote that Mrs. Gates needed "to return the items you retained or contact me for an appointment."

65. On August 16, 2021, Mr. Gates' counsel in the First Civil Litigation, Chad J. Kutmas, wrote an email to Det. Ramsey in response to her August 6 letter to Mrs. Gates.

66. In the email, Mr. Kutmas informed Det. Ramsey about the First Civil Litigation. Specifically, Mr. Kutmas told Det. Ramsey that Parra and Blundetto had sued Mr. Gates/Cogent/Alpha and had brought numerous claims, including unlawful taking of certain equipment (the equipment that Parra and Blundetto had told Ramsey that Mr. Gates "stole" from them).

67. Mr. Kutmas explained that Mr. Gates had been successful in the First Civil Litigation, had been awarded attorneys' fees, and that the Tulsa County District Court had "strongly admonished Mr. Blundetto while he was testifying on the witness stand from refraining to allege that he and his companies had been 'robbed' by the defendants (including Mr. Gates and other alleged suspects in your investigation)."

68. Mr. Kutmas offered to obtain a copy of the transcript from a hearing referenced in his email if Det. Ramsey deemed it "critical to [her] investigation."

69. Mr. Kutmas closed his email by instructing Det. Ramsey to review the dockets from the First Civil Litigation and after she had done so, to let Mr. Kutmas know if she still sought to interview Mr. and Mrs. Gates.

70. On August 17, 2021, Det. Ramsey responded to Mr. Kutmas's email, writing that the "civil case and criminal case are two completely different things when it comes to the job that we do as investigators." Det. Ramsey acknowledged that the Gateses' were within their rights to decline an interview but that she was required by the Tulsa County District Attorney's Office to reach out to

suspects under investigation and give them an opportunity to tell their side of things.

71. Mr. Kutmas and the Gateses discussed the matter and decided the Gateses would give an interview with their counsel present.

72. In late August 2021, Mr. Gates called Det. Ramsey and left her a message indicating his willingness to give an interview and for her to call him back to arrange a mutually agreeable time.

73. After receiving no response, Mr. Gates had Mr. Kutmas call and email Det. Ramsey in an effort to set up an interview. Det. Ramsey similarly ignored Mr. Kutmas's attempts to organize an interview.

74. Instead of conducting even a cursory investigation into Parra and Blundetto's dubious claims, Det. Ramsey ignored the overwhelming evidence from the First Civil Litigation exculpating Mr. and Mrs. Gates. And after being informed about said exculpatory evidence, Ramsey abandoned her initial plan of even interviewing the Gateses to hear their side of the story.

75. Instead, Ramsey applied for a search warrant based on Parra and Blundetto's obviously fabricated and uncorroborated stories.

76. Ramsey also watched video surveillance video provided by Blundetto that showed Mr. Gates and his employees moving the Nursing Home Lab Equipment form Suite 110 to Suite 130 and used it to attempt to justify the "probable cause" against Mr. and Mrs. Gates.

77. However, as discussed, *supra*, **Mr. Gates/Alpha owned the Nursing Home Lab Equipment**. Had Ramsey bothered to interview Mr. and Mrs. Gates or performed any kind of investigation, she would have realized that Mr. Gates owned the equipment and his moving it to Suite 130 was an innocent business decision.[4]

---

[4] Further, as a matter of common sense, it's patently unreasonable to think that Mr. Gates was attempting to "steal" property from Parra and Blundetto by moving large pieces of lab equipment a few feet down the hall in on the same floor of the office building. TPD's TRACIS report notes that one of the pieces of equipment moved "was so large that the suspects had to turn their single door

78. On November 16, 2021, TPD obtained a search warrant that listed several pieces of lab equipment belonging to Gates, including, but not limited to, the Nursing Home Lab Equipment.

79. The search warrant indicated that the "specific suite to be searched" was suite 130, the office to which Mr. Gates had moved the Nursing Home Lab Equipment that he, solely, owned.

80. On November 17, 2021, TPD conducted a search of the Office Complex.

81. Prior to the search, Parra and Blundetto obtained the keys to Suites 110 and 130 from Simple Church/Defendant DeBorde.

82. On the day of the search, Parra and Blundetto joined TPD in seizing numerous pieces of expensive lab equipment belonging to Gates.

83. Parra and Blundetto, along with DeBorde and Simple Church seized equipment beyond what was even listed on the search warrant. The Defendants knowingly seized equipment that belonged to Gates/Cogent/Alpha.

84. Importantly, the property listed in the search warrant that TPD – based on representations by Parra and Blundetto – claims was stolen by Gates was not listed in the APA, clearly indicating that Gates never sold Parra and Blundetto that property.

85. In executing the search warrant, TPD sent over a dozen armed officers storming into Gates's office, guns drawn. Some of the officers had "riot shields" and some were armed with "Tasers" or pepper gel guns.

86. When the officers, including Defendants Ramsey, Shockley, Holloway, Sires, and Sweger, marched into the building, Plaintiffs were fully compliant, unarmed, and did not attempt to flee or resist.

---

entry into Suite 130 into a double door." No reasonable person could have believed that Mr. Gates's actions were in any way nefarious, notwithstanding the fact that, again, *he was moving equipment of which he was the sole owner.*

87. Despite Mrs. Gates's compliance, she was forcefully grabbed and taken to the ground by several TPD officers, including Defendant Holloway.

88. Mr. Melendez was handcuffed, despite not appearing on the search warrant and not having committed any crime.

89. Officer Shockley took the handcuffed Mr. Melendez outside and told him to sit on the curb.

90. Mr. Melendez, having seen his mother being yelled at, grabbed, and taken to the ground, began to shout at the officers, exercising his clearly established First Amendment rights.

91. Mr. Melendez called the officers, including Defendant Shockley, "p*ssies" for being so rough on him and his mother.

92. In response to Mr. Melendez's protected expressions, Shockley used a leg sweep to take Mr. Melendez to the ground and forced him on his stomach. Mr. Melendez did not resist but continued to exercise his First Amendment rights by verbally protesting the officers', including Shockley's conduct.

93. In response, Shockley arrested Mr. Melendez for resisting arrest and obstruction.

94. Officer Sires arrested Mr. Gates arrested for embezzlement by an employee and conspiracy to commit a felony.

95. Officer Sweger arrested Mrs. Gates for embezzlement by an employee, conspiracy to commit a felony, obstruction, and resisting arrest.

96. The District Attorney's Officer never filed charges against Gates, his wife, his son, or any Cogent/Alpha employees because Gates was easily able to verify that the allegedly stolen property all rightly belonged to him/Cogent/Alpha, something Det. Ramsey already knew, or should have known.

97. Prior to the uses of force on Mrs. Gates and Mr. Melendez and the false arrests of Plaintiffs, TPD maintained a longstanding custom, pattern, and/or practice of using excessive force on suspects

who were unarmed, compliant, not posing a risk to officers, themselves, or anyone else. TPD also maintained a longstanding custom, pattern, and/or practice of arresting citizens with a total absence of probable cause. *See, e.g., Wilkins v. City of Tulsa, Oklahoma,* 33 F.4th 1265 (10th Cir. 2022); *Brooks v. City of Tulsa, et al.,* Case No. 22-CV-142-GKF-JFJ (N.D. Okla. 2022); *Fields v. City of Tulsa, et al.,* Case No. 23-5001 (10th Cir. 2023); *Hankins v. City of Tulsa, et al.,* Case No. 22-CV-515-TCK-CDL (N.D. Okla. 2022); *Rucker v. City of Tulsa, et al.,* Case No. 23-CV-237-CVE-MTS (N.D. Okla. 2023); *Lunsford v. City of Tulsa, et al.,* Case No. 22-CV-347-CVE-JFJ (N.D. Okla. 2022).

## COUNT 1 – WRONGFUL/UNREASONABLE ARREST
## 42 U.S.C. § 1983

98. Paragraphs 1-97 are incorporated herein by reference.

99. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons … against unreasonable … seizures, shall not be violated, and no warrants shall issue, but upon probable cause…."

100. In determining the existence of probable cause, Courts are required to include exculpatory evidence that was ignored, omitted or suppressed by law enforcement.

101. When one considers the evidence that was omitted, ignored or suppressed by Det. Ramsey and Officers, Sweger, Sires, and Shockley, there was plainly no probable cause for the arrest of Plaintiffs.

102. Probable cause to arrest exists only when the facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.

103. As discussed, *supra,* there was a complete absence of probable cause to arrest the

Gateses for allegedly stealing lab equipment from Parra and Blundetto.

104.     Further, there was no probable cause to arrest Mr. Melendez for resisting arrest or obstruction.

105.     The wrongful arrests of Plaintiffs lacked probable cause, as required by the Fourth Amendment, as applied to the States by the Fourteenth Amendment. These wrongful arrests violated Plaintiffs' Fourth Amendment right to be secure against unreasonable seizure, and violated Plaintiffs' Fourth Amendment-protected sense of security and individual dignity.

106.     There were no, or wholly insufficient, facts and circumstances within Det. Ramsey's knowledge, and of which she had reasonably trustworthy information, sufficient to warrant a woman of reasonable caution in the belief that any of crimes for which Mr. and Mrs. Gates were arrested had been committed.

107.     These wrongful arrests were a proximate cause of Plaintiffs' imprisonment, emotional distress, pain and suffering, and the damages as alleged herein.

### COUNT 2 – EXCESSIVE USE OF FORCE
### 42 U.S.C. § 1983
### (Defendants Shockley, Holloway, and City of Tulsa)

108.     Paragraphs 1-107 are incorporated herein by reference.

109.     At the time of the complained of events, Mrs. Gates and Mr. Melendez, as free people, had clearly established constitutional rights under the Fourth Amendment to be secure in their person and free from unreasonable seizure through objectively unreasonable excessive force to injure them and their bodily integrity.

110.     In the totality of the circumstances, Mrs. Gates and Mr. Melendez were unarmed, cooperative, in no way actively resisting or attempting to evade TPD by flight, and in no way posing any immediate threat to the safety of TPD officers, themselves, or others.

111.     Any reasonable police officer would, or should, have known of these rights at the

time of the complained of conduct as they were clearly established at that time.

112. The actions of Officer Holloway in forcefully grabbing, pushing, and taking down Mrs. Gates, a small woman in her 60s, were objectively unreasonable and excessive uses of force under the circumstances, and thereby violated the Fourth Amendment rights of Mrs. Gates.

113. The actions of Officer Shockley in forcefully grabbing, using a leg sweep, and taking down Mr. Melendez while he was handcuffed, were objectively unreasonable and excessive uses of force under the circumstances, and thereby violated the Fourth Amendment rights of Mr. Melendez.

114. Shockley's and Holloway's Defendants' uses of force were also malicious and/or involved reckless, callous, and deliberate indifference to Plaintiff's federally protected rights.

115. Holloway and Shockley unlawfully seized Mrs. Gates and Mr. Melendez, respectively, by means of objectively unreasonable, excessive physical force, thereby unreasonably restraining them of their freedom and causing them multiple serious bodily injuries, as well as mental pain and anguish, and the damages alleged herein.

116. As a proximate result of the Holloway's and Shockley's unlawful conduct, Mrs. Gates and Mr. Melendez have suffered actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

### COUNT 3 – MUNICIPAL LIABILITY
### (City of Tulsa)

117. Paragraphs 1-116 are incorporated herein by reference.

118. There is an affirmative link between the deprivation of Plaintiffs' constitutional rights and TPD policies, practices and/or customs which the City promulgated, created, implemented and/or possessed responsibility for.

119. The policies or customs include:

A. A failure to adequately train and/or supervise TPD officers, including Det. Ramsey and Officers Holloway, Sweger, Mires, and Shockley, with respect to the Fourth Amendment rights of citizens;

B. A failure to adequately train and/or supervise TPD officers, including Det. Ramsey and Officers Holloway, Sweger, Mires, and Shockley, with respect to probable cause to arrest as mandated by the Fourth Amendment;

C. A failure to adequately train and/or supervise TPD officers, including Det. Ramsey, with respect to proper documentation of probable cause through probable cause affidavits utilized to initiate criminal proceedings against citizens;

D. A specific failure to adequately train and/or supervise TPD officers, including Det. Ramsey, to not omit exculpatory information from probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens;

E. An established pattern, practice and custom of TPD officers seizing persons without probable cause;

F. An established pattern, practice and custom of TPD officers omitting exculpatory information from probable cause affidavits and other documents utilized to initiate criminal proceedings against citizens;

G. A failure to reprimand or discipline -- and/or ratifying the conduct of -- officers who violate the Fourth Amendment rights of citizens;

H. A failure to adequately train and/or supervise TPD officers, including Officers Holloway and Shockley, with respect to the use of force on suspects, including suspects who are unarmed, compliant, do not pose a risk of safety to anyone, and/or subdued; and

I. An established pattern, practice and custom of TPD officers using unreasonable

force on suspects who are unarmed, compliant, do not pose a risk to the safety to anyone, and/or subdued.

120. Prior to the wrongful arrest of and excessive use of force on Plaintiffs, there have been numerous other instances of constitutional deficiencies within the TPD that the City was aware of, but failed to alleviate.

121. In deliberate indifference to the harm likely to result, the City took either no remedial action, or inadequate remedial action, in response to the prior constitutional violations conducted by its officers.

122. Thus, the City has created and tolerated and maintained long-standing, unconstitutional department-wide customs, law enforcement related policies, procedures and practices, and failed to properly train and/or supervise its officers in a manner amounting to deliberate indifference with respect to uses of force and unlawful arrest.

123. The deliberately indifferent training and supervision provided by Defendant City resulted from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendant City and were also moving forces behind the violation of Plaintiffs' civil rights and the resulting injuries alleged herein.

124. As a direct result of Defendants' unlawful conduct, Plaintiffs has suffered serious actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

### COUNT 4 – FIRST AMENDMENT RETALIATION
### (Officer Shockley)

125. Paragraphs 1-124 are incorporated herein by reference.

126. The "First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill,* 482 U.S. 451, 461 (1987).

127. "The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." *Id.* at 462-63.

128. Mr. Melendez was arrested for criticizing the TPD Officers', including Officer Shockley's conduct in handcuffing the Plaintiffs and arresting Mr. and Mrs. Gates. "The Constitution does not allow such speech to be made a crime." *Id.* at 462.

129. In retaliating against Mr. Melendez for criticizing TPD's actions and calling the officers "p*ssies," Officer Shockley violated Mr. Melendez's clearly established First Amendment rights.

130. As a direct result of Shockley's unlawful conduct, Mr. Melendez has suffered serious actual physical and emotional injuries, and other damages and losses as described herein entitling him to compensatory and special damages, in amounts to be determined at trial.

### COUNT 5 – NEGLIGENCE (City of Tulsa)

131. Paragraphs 1-130 are incorporated herein by reference.

132. In Oklahoma, "[a] defendant is generally said to owe a duty of care to all persons who are foreseeably endangered by his conduct with respect to all risks that make the conduct unreasonably dangerous." *Morales v. City of Oklahoma City ex rel. Oklahoma City Police Dep't,* 230 P.3d 869, 878 (Okla. 2010).

133. Because, however, the act of making an arrest necessarily involves some risk of harm to the arrestee, "a police officer has a special dispensation from the duty of ordinary care not to endanger others." *Morales,* 230 P.3d at 880.

134. In particular, "[a] police officer's duty ... is to use only such force in making an arrest as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the arrest." *Id.*

135. Here, Defendants owed a duty to Mrs. Gates and Mr. Melendez to use only such force in securing their cooperation as a reasonably prudent police officer would use in light of the objective circumstances confronting the officer at the time of the incident.

136. Holloway and Shockley breached that duty by using objectively unreasonable and excessive force as described herein.

137. Defendants also owed a duty to Plaintiffs to arrest only those citizens for which there was probable cause that they had committed a crime.

138. Defendants breached that duty by arresting Plaintiffs as described herein.

139. Defendants' breach of their duty was the proximate cause of Plaintiffs' damages as described herein.

140. At all pertinent times, Defendants Holloway, Shockley, Ramsey, Sires, and Sweter were acting within the scope of their employment and the City is vicariously liable for their negligent acts.

141. Plaintiffs filed a Tort Claim Notice with the City of Tulsa on November 17, 2022. The original Complaint was filed within 180 days of the denial of said Notice.

## COUNT 6 – PUNITIVE DAMAGES

142. Paragraphs 1-141 are incorporated herein by reference.

143. Defendants have acted intentionally, maliciously and/or in reckless disregard for the rights of Plaintiffs.

144. Accordingly, Plaintiffs are entitled to recover punitive damages Defendants Holloway, Shockley, Ramsey, Sires, and Sweter for their actions as set forth herein in an amount in excess of $75,000.00.

145. The intentional, wanton and reckless conduct of Defendants Holloway, Shockley, Ramsey, Sires, and Sweter in disregard of Plaintiffs and others is, and was, conducted with full

knowledge, in that Holloway, Shockley, Ramsey, Sires, and Sweter knew, or should have known, of the severe adverse consequences of its actions upon Plaintiffs and others.

146. Holloway, Shockley, Ramsey, Sires, and Sweter have acted intentionally, maliciously and in reckless disregard for the rights of Plaintiffs. As a result, the Plaintiffs are entitled to recover punitive damages against Holloway, Shockley, Ramsey, Sires, and Sweter for these actions.

WHEREFORE, based on the foregoing, Plaintiffs pray the Court grant the relief sought herein, actual damages in excess of $75,000.00, punitive damages in excess of $75,000.00, reasonable attorney fees and costs, and all other relief deemed appropriate and equitable by this Court.

Respectfully submitted,

**SMOLEN & ROYTMAN**

/s/Daniel E. Smolen
Daniel E. Smolen, OBA #19943
701 South Cincinnati Avenue
Tulsa, Oklahoma 74119
(918) 585-2667
(918) 585-2669 (Fax)
danielsmolen@ssrok.com
*Attorneys for Plaintiffs*