**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OKLAHOMA**

(1) ROBERT GATES,
(2) ROBERT GATES, as Personal Representative of the Estate of RITA GATES, deceased, and
(3) JULIO MELENDEZ,

Plaintiffs,

vs.

(1) CITY OF TULSA, OKLAHOMA
(2) SAMANTHA RAMSEY,
(3) DON HOLLOWAY,
(4) M. SWEGER,
(5) THOMAS SHOCKLEY,
(6) K. SIRES,

Defendants.

Case No. 25-cv-00640-JFH-JFJ

**JOINT STATUS REPORT (FOR CASES WITH A PRESIDING DISTRICT JUDGE)**

**Jury Demanded**: Yes ☒ No ☐

## I. Summary of Claims:

In 2017, Plaintiff Robert Gates founded a high complexity medical testing laboratory in Tulsa named Cogent Medical Laboratory, LLC ("Cogent"). Cogent's primary business since its inception was to provide blood testing services to various nursing homes and care facilities throughout Oklahoma and neighboring states. In the summer of 2020, in the midst of the initial wave of the COVID-19 pandemic, Michael Parra and Michael Blundetto approached Mr. Gates about using Cogent's lab in Suite 110 of the Office Complex to perform COVID-19 PCR testing for the government. At the time, Parra and Blundetto represented to Mr. Gates that they had a contract with the Federal Government to provide COVID testing for the Veteran's Administration ("VA") hospital system, and that the contract would generate between 300,000 and 1,000,000 COVID tests per month. Parra and Blundetto estimated that the revenue generated by this contract would be at least $18 million/month. Unbeknownst to Mr. Gates, Parra and Blundetto had no such contract or agreement with the Federal Government.

On October 5, 2020, Cogent entered into an Asset Purchase Agreement ("APA") with Optimum, under which Optimum was to purchase certain lab equipment and assets from Cogent as listed in the APA. At the time, the assets sold to Optimum were those assets necessary for Optimum to operate a COVID laboratory ("the COVID Lab"). Cogent retained the assets utilized in connection with the blood and other tests for nursing homes ("the Nursing Home Lab"). Mr. Gates decided to operate the Nursing Home Lab under a new entity, Alpha Medical Laboratory ("Alpha").

In or around November 2020, Mr. Gates/Alpha leased Suite 130 of the Office Complex from Simple Church and planned to move the Nursing Home Lab equipment into Suite 130. However, moving the Nursing Home Lab equipment to Suite 130 required significant work and care, as the equipment is expensive and difficult to safely move. Additionally, work needed to be done to Suite 130 to prepare it for operation. As a result, there was a period of transition in November 2020 during which the COVID Lab (owned by Optimum/Parra/Blundetto) and the Nursing Home Lab (owned by Cogent/Alpha/Gates) operated side-by-side. During this time, Gates managed both the COVID Lab and Nursing Home Lab. He also maintained an office in Suite 215 of the Office Complex.

Unfortunately, by January 2021, the relationship between Gates and Parra and Blundetto was strained for myriad reasons. Most importantly, Optimum never paid Alpha the consideration under the APA. The APA required Optimum (Blundetto and Parra) to make monthly payments on certain debt obligations of Cogent/Alpha to Simmons Bank and Medicare totaling approximately $1.5 million. ***However, Blundetto and Parra never made a single payment.*** Gates discovered that Parra and Blundetto withdrew $500,000 from the Optimum account – of which he was 1/3 owner – and paid directly to Parra and Blundetto individually. Parra and Blundetto took this money without Gates' consent and for no legitimate business purpose. Around the end of January 2021, Gates moved the Nursing Home Lab equipment into the new space in Suite 130 down the hall from Suite 110. The equipment Gates moved was solely owned by Cogent/Alpha and was not included in the APA with Parra, Blundetto and Optimum. Once Gates finished moving the Nursing Home Lab equipment to Suite 130, Parra and Blundetto became upset. They acted as if Optimum had purchased all of Cogent's assets, as opposed to just the COVID testing equipment. The APA, however, clearly provides that Optimum was to only acquire certain COVID testing equipment and not the Nursing Home Lab equipment.

In retaliation for Gates moving the equipment that he solely owned down the hall, Parra and Blundetto filed a civil lawsuit, against Gates, alleging, *inter alia,* that Gates had stolen the Nursing Home Equipment when he moved it to Suite 130. In May 2021, Tulsa County District Judge Nightingale held an evidentiary hearing on Parra and Blundetto's second request for injunctive relief and return of the Nursing Home Lab equipment at issue in the First Civil Litigation. Shortly thereafter, Judge Nightingale entered an Order awarding Mr. Gates over $40,000.00 in attorneys' fees arising from the legally infirm action. Blundetto and Parra have not paid any of this award as of this submission.

Parra and Blundetto subsequently made numerous blatantly false statements to the Tulsa Police Department ("TPD"), falsely claiming Gates had stolen significant amounts of lab equipment from them. On August 6, 2021, Defendant Ramsey sent both Mr. and Mrs. Gates a letter indicating that she was investigating a criminal case in which they were listed as suspects. Detective Ramsey wrote that Parra and Blundetto were claiming that Mr. and Mrs. Gates committed fraud and had "provided evidence to support their claim." On August 16, 2021, Mr. Gates' counsel in the First Civil Litigation, Chad J. Kutmas, wrote an email to Det. Ramsey in response to her August 6 letters to Mr. and Mrs. Gates. In the email, the email, Mr. Kutmas informed Det. Ramsey about the First Civil Litigation. Specifically, Mr. Kutmas told Det. Ramsey that Parra and Blundetto had sued Mr. Gates/Cogent/Alpha and had brought numerous claims, including unlawful taking of certain equipment (the equipment that Parra and Blundetto had told Ramsey that Mr. Gates "stole" from them).

Mr. Kutmas explained that Mr. Gates had been successful in the First Civil Litigation, had been awarded attorneys' fees, and that the Tulsa County District Court had "strongly admonished Mr. Blundetto while he was testifying on the witness stand from refraining to allege that he and his companies had been 'robbed' by the defendants (including Mr. Gates and other alleged suspects in your investigation)." Mr. Kutmas offered to obtain a copy of the transcript from a hearing referenced in his email if Det. Ramsey deemed it "critical to [her] investigation." Mr. Kutmas closed his email by instructing Det. Ramsey to review the dockets from the First Civil Litigation and after she had done so, to let Mr. Kutmas know if she still sought to interview Mr. and Mrs. Gates.

Instead of conducting even a cursory investigation into Parra and Blundetto's dubious claims, Det. Ramsey ignored the overwhelming evidence from the First Civil Litigation exculpating Mr. and Mrs. Gates. And after being informed about said exculpatory evidence, Ramsey abandoned her initial plan of even interviewing the Gateses to hear their side of the story. Instead, Ramsey applied for a search warrant based on Parra and Blundetto's obviously fabricated and uncorroborated stories. Had Ramsey bothered to interview Mr. and Mrs. Gates or performed any kind of investigation, she would have realized that Mr. Gates owned the equipment and his moving it to Suite 130 was an innocent business decision.

On November 16, 2021, TPD obtained a search warrant that listed several pieces of lab equipment belonging to Gates, including, but not limited to, the Nursing Home Lab Equipment. The property listed in the search warrant that TPD – based on representations by Parra and Blundetto – claims was stolen by Gates was not listed in the APA, clearly indicating that Gates never sold Parra and Blundetto that property. In executing the search warrant, TPD sent over a dozen armed officers storming into Gates's office, guns drawn. Some of the officers had "riot shields" and

some were armed with "tasers" or pepper gel guns. During execution of the search warrant: TPD officers, including Defendant Holloway, used excessive force on Mrs. Gates and falsely arrested her, in violation of her Fourth Amendment rights; TPD officers, including Defendant Shockley, falsely arrested Plaintiff Melendez, in violation of his First and Fourth Amendment rights, and Defendant Sires falsely arrested Mr. Gates, in violation of his Fourth Amendment rights.

Plaintiffs sued the aforementioned TPD officers, under 42 U.S.C. § 1983, for violations of their Fourth amendment rights, and, in the case of Mr. Melendez, in violation of his First and Fourth Amendment rights.

Plaintiffs have also sued Defendant City of Tulsa, under 42 U.S.C. § 1983 under a municipal liability theory, alleging that the City maintained unconstitutional policies, practices, and/or customs with respect to, *inter alia,* probable cause, search warrants, and use of force

A. Claims to be Dismissed: None by Plaintiffs

Defendant City of Tulsa seeks dismissal of: (1) all state-law tort claims asserted by Plaintiff Julio Melendez; and (2) all municipal liability claims asserted against the City of Tulsa under 42 U.S.C. § 1983. *See* Dkt. 14.

## II. **Summary of Defenses**:

### A. Defendant City of Tulsa

a. Plaintiffs' Complaint may fail to state a claim upon which relief may be granted against the City.
b. All tort claims are subject to the provisions of the Oklahoma Governmental Tort Claims Act, 51 O.S. §§ 151 *et seq*.
c. Plaintiffs failed to mitigate their damages.
d. The City is not responsible for intervening, superseding, and/or supervening causes that resulted in damages.
e. The City is not the proximate cause of Plaintiffs' damages.
f. The injuries and damages alleged, if any, were the result of Plaintiffs' own conduct.
g. Plaintiffs assumed the risk of their behavior when they acted in a manner that was in violation of the law and was not consistent with the safety and well-being for themselves and others.
h. Plaintiffs' claims are absolutely barred by their own actions.
i. The City is not subject to vicarious or *respondeat superior* liability for any bad faith, malicious, or intentionally wrongful conduct of any employee. Furthermore, all allegations of intentional wrongful conduct are denied.
j. Punitive or exemplary damages are not available per 51 O.S. § 154(C).
k. Plaintiffs' punitive damage claims are unlawful under the U.S. Constitution, as well as the Oklahoma Constitution
l. Plaintiffs' claims are, or may be, denied by waiver, laches, estoppel, and/or failure to comply with the statues of limitation.
m. The individual Defendants had probable cause for any and all actions taken and acted at all times objectively and reasonably, in good faith, and without malice.
n. The City and its employees are immune from suit due to absolute immunity and qualified immunity.

o. To the extent any Defendant violated Plaintiffs' federal and/or state constitutional rights (which is denied), those individuals were not acting in accord with any policy, custom, scope, or training of the City.
p. The City denies there is any direct causal link which supports Plaintiffs' claims that any policy or custom, or the alleged failure of the City to adopt a policy or custom, or to adequately train or supervise any City employee was the direct cause of any damage or injury to Plaintiffs.
q. The City's policies were lawful on their face and Plaintiffs cannot prove that the City had notice of its alleged failure to act, awareness that the failure to act resulted in a constitutional deprivation, and that the City consciously chose to disregard the harm.
r. Absent a properly proven predicate constitutional violation by an individual defendant, the City cannot be held liable under Section 1983 for alleged failures of policy, training, or supervision.
s. To the extent any Defendant violated any Plaintiffs' federal or state constitutional right, the City did not acquiesce, accept, endorse, or act in a manner that is inconsistent with its obligations to its citizenry and in violation of any Constitutional rights.
t. Plaintiffs cannot establish that any complained of conduct by the City and/or its policy makers was taken with the requisite degree of culpability or demonstrate a direct causal link between the municipal action and the alleged deprivation of federal rights.
u. If any of the TPD officers' conduct violated Plaintiffs' state or federal constitutional rights, the City did not act or fail to act in any way that would have ratified that specific conduct or the basis for it.
v. If any of the TPD officers' conduct violated Plaintiffs' state or federal constitutional rights, the officers were not acting within any policy or custom of the City.
w. The City's actions were at all times reasonable under the circumstances.
x. To the extent Plaintiffs' Constitutional rights were violated (which is denied), those rights were not, or may not have been, clearly established at the time of the alleged unlawful conduct.
y. Any official capacity claim against an individual defendant is merely and solely a claim against the City.

**B. Individual Defendants – Samantha Ramsey, Don Holloway, Madelyne Sweger, Thomas Shockley, Kurth Sires**

a. Plaintiffs fail to state a claim upon which relief may be granted.
b. At the time Plaintiffs were arrested, the contours of their constitutional rights were not clearly established.
c. Defendants are entitled to the defense of qualified immunity.
d. Defendants deny they had actual or constructive notice that their actions or any failures to act were substantially certain to result in a violation of Plaintiffs' constitutional rights, nor did they consciously or deliberately choose to disregard any such risk of harm.
e. The Defendants' actions were at all times objectively reasonable under the circumstances.
f. Probable cause existed to arrest Plaintiffs, thus they fail to state a claim upon which relief may be granted.
g. Plaintiffs' claims are, or may be, denied by waiver, laches, estoppel, and/or failure to comply with statutes of limitation.

h. Defendants deny any and all allegations that their actions or inactions are the cause of any damages.
i. There is no evidence that Defendants acted with any malice toward Plaintiffs.
j. Plaintiffs failed to mitigate their damages.
k. The damages complained of may have been caused in whole or in part by third parties over whom Defendants exercise no control.
l. Plaintiffs' alleged injuries were caused by Plaintiffs' own comparative negligence.
m. Plaintiffs' alleged injuries were caused by Plaintiffs' criminal, illegal, unreasonable, and intentional and/or negligent actions.
n. Plaintiffs assumed the risk of their behavior when they acted in a manner that was in violation of the law and was not consistent with the safety and well-being for themselves and others.
o. Defendants deny they were negligent.
p. Defendants are not responsible for intervening, superseding, and/or supervening causes that resulted in damages.
q. Plaintiffs' alleged injuries were pre-existing and not the result of any action by Defendants.
r. No facts support the imposition of punitive damages against Defendants.
s. Punitive damages are not available under 51 O.S. §154 (C).
t. Plaintiffs' punitive damage claims are unlawful under the U.S. Constitution and the Oklahoma Constitution.
u. Official capacity claims against individual defendants, such as Defendants, are merely and solely claims against the City. *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).

C. Defenses to be Abandoned: None.

**III. Motions Pending** (Include Docket Number, Description and Date at Issue)**:**

Dkt. 14: City of Tulsa's Partial Motion to Dismiss, filed December 22, 2025

**IV. Stipulations:**

A. Jurisdiction Admitted: Yes ☒ No ☐ (If no, explain.)

B. Venue Appropriate: Yes ☒ No ☐ (If no, explain.)

C. Facts: At all pertinent times, Defendants Ramsey, Holloway, Sweger, Shockley, and Sires were acting under color of state law.

D. Law: None.

**V. Proposed Deadlines:**

A. Parties to be Added by: April 3, 2026

B. Proposed Discovery Cutoff Date (4 Months of Discovery Unless Extended by the Court for Good Cause): December 18, 2026

C. Fact Witness Lists to be Exchanged by: May 22, 2026

D. Proposed Date for Expert Reports by Plaintiff and Defendant: Plaintiff: August 21, 2026. Defendants: September 25, 2026

## VI. Fed. R. Civ. P. 26(f) Discovery Plan

A. Should any changes be made to the timing, form or requirements for disclosures under Rule 26(a)?
Yes ☐ (If yes, explain.)
No ☒

B. When were or will initial disclosures under Rule 26(a)(1) be made? April 3, 2026.

Note that pursuant to Rule 26(a)(1), initial disclosures must be made within 14 days after you confer for the purpose of preparing this discovery plan. All parties are under an affirmative duty to (i) comply with the mandatory disclosure requirements, and (ii) notify the Court of any non-disclosure so that the issue can be promptly referred to a magistrate judge for resolution. Failure of any party to disclose information or failure of any party to bring disclosure issues to the Court's attention in a timely manner may result in sanctions, including prohibiting the use of that information at trial pursuant to Rule 37(c)(1).

C. Should discovery be conducted in phases and/or should discovery be limited at this time to particular subject matters or issues?
Yes ☐ (If yes, explain.)
No ☒

D. Should any changes be made in the limitations on discovery imposed by the Federal Rules of Civil Procedure or the Local Civil Rules?
Yes ☐ (If yes, explain.)
No ☒

E. Proposed Number of Fact and Expert Depositions:

1. To be allowed for Plaintiff? Fact: 15. Expert: 3.

2. To be allowed for Defendant? Fact: 15. Expert: 3.

F. Is there a need for any special discovery management order(s) by the Court?
Yes ☐ (If yes, explain.)
No ☒

G. The parties are directed to Guidelines for Discovery of Electronically Stored Information on the public website at www.oknd.uscourts.gov for advice on the production of electronic information.

## VII. Anticipated Dispositive Motions?

Yes ☒ (If yes, explain.). All Defendants anticipate filing motions for summary judgment.
No ☐

**VIII. Do all parties consent to trial before the assigned magistrate judge**? Yes ☐ No ☒

If yes, please email a proposed Consent to Magistrate for Trial (AO-085) to the Clerk via the designated mailbox at CM-ECFIntake_OKND@oknd.uscourts.gov and indicate the month and year in which trial by the magistrate judge is requested. Please do not file proposed documents as an attachment to a document. (Refer to Section XIV of the CM/ECF Administrative Guide of Policies and Procedures for further instruction regarding proposed documents.)

**IX. Is there any matter that should be referred to the assigned magistrate judge for final disposition upon partial consent of all the parties pursuant to Local Rule 73.1**?Yes ☐ No ☒

If yes, please email a completed, proposed Consent to Magistrate Disposition Motion (AO 085A) to the Clerk via the designated mailbox at CM-ECFIntake_OKND@oknd.uscourts.gov. Please do not file proposed documents as an attachment to a document. (Refer to Section XIV of the CM/ECF Administrative Guide of Policies and Procedures for further instruction regarding proposed documents.)

**X. Settlement Plan** (Check one):

☒ Settlement Conference Requested After: Discovery cut-off.
Describe Settlement Judge Expertise Required, If Any: 42 U.S.C. § 1983; wrongful/unreasonable arrest under the Fourth Amendment; excessive force under the Fourth Amendment; First Amendment retaliation; *Monell*/municipal liability

☐ Private Mediation Scheduled On: N/A

☐ Other ADR (Explain): N/A

ADR Appropriate:
Yes ☐
No ☒

Copy of the Court's ADR Booklet Provided to Clients as Required?

Plaintiffs: Yes ☒ No ☐

Defendants: Yes ☒ No ☐

**XI. Does this case warrant special case management?**
Yes ☐ (If yes, explain.)
No ☒

**XII. Do the parties request that the Court hold a scheduling conference?** Yes ☐ No ☒

If a conference is not requested or ordered by the Court, the Court will, after receiving this report, issue a scheduling order based on the information contained in this report.

**XIII. Estimated Trial Time:** 5-7 days.

/s/Daniel E. Smolen
Daniel E. Smolen, OBA#19943
Robert M. Blakemore, OBA #18656
SMOLEN & ROYTMAN
701 S. Cincinnati Ave.
Tulsa, Oklahoma 74119
P: (918) 585-2667
F: (918) 585-2669
danielsmolen@srlawok.com
bobblakemore@srlawok.com
*Attorneys for Plaintiffs*

/s/Nicholas C. Williams
Nicholas C. Williams, OBA #33787
Assistant City Attorney
R. Lawson Vaughn, OBA #21557
Senior Assistant City Attorney
City of Tulsa City Attorney's Office
City Hall, One Technology Center
175 E. Second Street, Suite 685 Tulsa, Oklahoma 74103
Telephone (918) 596-7713
Facsimile (918) 596-9700
nicholaswilliams@cityoftulsa.org
lvaughn@cityoftulsa.org

*Attorneys for Defendants*